## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COLD STONE CREAMERY, INC., an
Arizona corporation; and COLD STONE
CREAMERY LEASING COMPANY,
INC., an Arizona corporation,

      Plaintiffs,

v.

LENORA FOODS, I, LLC, a Florida
limited liability company; LENORA
FOODS II, LLC, a Florida limited liability
company; LENORA FOODS, III, LLC, a
Florida limited liability company; CECIL
D. ROLLE, individually; and
JACQUATTE ROLLE, individually,

      Defendants.

_____/

Case No. 4:07cv303RLH/WCS
Florida Bar No. 0393517

## PLAINTIFFS' REPLY TO AFFIRMATIVE DEFENSES
## AND ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIM

The Plaintiffs/Counter-Defendants, COLD STONE CREAMERY, INC. and COLD
STONE CREAMERY LEASING COMPANY, INC., deny each of Defendants' affirmative
defenses, and Plaintiff Cold Stone Creamery, Inc. answers (in bold, following the individual
allegations) the Defendants'/Counter-Plaintiffs' Counterclaim (filed August 24, 2007) and state:

## PARTIES, JURISDICTION AND VENUE

1.    Counter-Plaintiff Lenora Foods I, LLC ("Lenora I"), is a limited liability
company organized and existing under the laws of the State of Florida with its principal place of
business located in Tallahassee, Florida.

**Admitted for jurisdictional purposes only.**

2.      Counter-Plaintiff Lenora Foods, II, LLC ("Lenora II"), is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business located in Tallahassee, Florida.

**Admitted for jurisdictional purposes only.**

3.      Counter-Plaintiff Lenora Foods III, LLC ("Lenora III"), is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business located in Ocala, Florida.

**Admitted for jurisdictional purposes only.**

4.      Counter-Plaintiff Jacquatte Rolle is a citizen of the State of Florida residing in Gainesville, Florida, and is the sole of owner of Lenora I, Lenora II, and Lenora III ("Jacquatte Rolle" or "Owner").

**Admitted for jurisdictional purposes only.**

5.      Counter-Defendant Cold Stone Creamery, Inc. ("Cold Stone") is a corporation organized and existing under the laws of the State of Florida with its principal place of business located in Scottsdale, Arizona.

**Admitted.**

6.      There is complete diversity and each and every state law claim below is for sums in excess of Seventy-five Thousand Dollars ($75,000), exclusive of attorneys' fees, interest and costs. Accordingly, this court has diversity jurisdiction over this action and each of the counterclaims pursuant to 28 U.S.C. § 1332.

**Admitted as to diversity and that the Court has jurisdiction over Plaintiffs' claims. Without knowledge and therefore denied as to the remainder.**

7.    Venue is proper because a substantial part of the events giving rise to this action occurred within this judicial district.

**Admitted for jurisdictional purposes only.**

## ALLEGATIONS COMMON TO ALL COUNTS

8.    Lenora I, II and III, and Jacquatte Rolle (referred to herein collectively as "Counter-Plaintiffs"), own and operate three Cold Stone Franchises; namely, the Cold Stone franchise in the Tallahassee Mall next to the AMC Theater ("the Tallahassee Mall store"), the Cold Stone franchise located directly across from Florida State University on Tennessee Street ("the FSU Campus Store"), and a Cold Stone franchise in Ocala, Florida ("the Ocala Store").

**Admitted that one or more Counter-Plaintiffs have operated the three locations. Denied that Counter-Plaintiffs "owned" the franchises; denied that Lenora Foods III, LLC has any legitimate interest in any Cold Stone franchise.**

9.    Cold Stone's website lists a series of frequently asked questions regarding owning a Cold Stone Creamery franchise. In response to the question "How much money can I earn each year?," Cold Stone responds "franchising law forbids all franchise concepts from answering this question. We can tell you that our average unit volume is $381,985 per year. We invite you to speak with our current franchisees to learn about their sales and profit numbers." Despite the fact that it recognizes that it cannot promise returns on a franchisee's investment, Cold Stone disseminates false profit information to its franchisees intending for its franchisees to pass along the information to prospective franchisees so as to induce the prospective franchisees to purchase a franchise.

**Admitted that Cold Stone maintains a website which contains frequently asked questions. Denied as to the remaining allegations.**

10.    Cold Stone does so because its objectives are to rapidly expand so that it can continue to tout itself as the "fastest-growing super-premium ice cream concept in the country," and generate greater royalties, advertising fees, and sale more products to franchisees.

**Denied.**

11.    Prior to purchasing the franchises and pursuant to Cold Stone's explicit instructions, Counter-Plaintiffs contacted existing franchisees who informed them that Cold Stone tells its existing franchisees that they should expect a 20% profit.

**Without sufficient knowledge and therefore denied.**

12.    Cold Stone tells its franchisees that a properly run franchise should realize a 20% profit even though Cold Stone knows that such profits are highly improbable given the costs of acquiring and operating a Cold Stone franchise in accordance with Cold Stone's business model.

**Denied.**

13.    In any event, Cold Stone clearly knows that its franchisees are passing along false profit numbers to prospective franchisees because Cold Stone provides the false information to existing franchisees and specifically directs prospective franchisees to secure the numbers from existing franchisees, thus doing indirectly what it cannot do directly. The fact that Cold Stone co-opts its existing franchisees to help perpetrate the fraud makes the dissemination of such information no less fraudulent.

**Denied.**

14.    To further lure prospective franchisees, Cold Stone claims that "Cold Stone's franchise opportunities are about as solid as they come."

**Denied.**

15.    Counter-Plaintiffs purchased the franchises based on Cold Stone's misrepresentations that it was a "solid" investment, that Counter-Plaintiffs would "[p]rofit by making people happy", and that Counter-Plaintiffs could expect a 20% profit.

**Denied.**

16.    Cold Stone knows that its business model is not designed to control costs and in fact inflates costs such that it is nearly impossible for franchisees to be profitable.

**Denied.**

17.    Upon information and belief, Cold Stone charges greater royalties than its biggest competitor, Marble Slab, and requires an initial outlay of between $100,000.00 to $150,000.00 greater than the startup costs for a Marble Slab franchise.

**Without knowledge and therefore denied.**

18.    Of particular significance and as yet another example of its fraudulent conduct, Cold Stone effectively charges more than the 9% disclosed in the franchise agreements (3% Advertising and 6% Royalties) because Cold Stone receives "kick backs" from the very vendors which it requires franchisees to use pursuant to the franchisee agreements.

**Denied.**

19.    There are other operational failures in terms of day-to-day operations. For example, Cold Stone liberally dumps coupons on the market despite the adverse impact that such a widespread dissemination of coupons has on its franchisees. Most recently, Cold Stone repeatedly dumped cake coupons on the market. Cakes are made on the premises and require a significant amount of labor and the use of a large volume of product. Moreover, given Cold Stone's requirements regarding freshness, many cakes must be discarded before sale. When you combine the time and supplies associated with producing cakes and the percentage of cakes that must be

discarded before sale, coupled with the loss on these coupons, cakes are sold at below cost.

**Denied as to the alleged operational failures. Admitted that Cold Stone provides coupons, but denied as to the characterization of their provision. Without knowledge as to the remaining allegations.**

20.     The best evidence that Cold Stone's scheme is not economically viable and that Cold Stone oversells itself and the prospects of success to its prospective franchisees is the string of Cold Stone franchise failures resulting in franchisees dumping Cold Stone franchises below startup costs. Based on Cold Stone's published information, as of July 2007, no less than 16.64% of all Cold Stone franchises were listed for sale with many of those franchises listed for sale for far less than the current startup costs for a new Cold Stone franchise which is between $294,250.00 and $438,850.00 according to Cold Stone's own website. In stark contrast, as of July 2007, less than 1% of all Subway franchises were listed for sale, even though Subway has 20 times the number of franchises. Where a reputable franchisor such as Subway erects a financially viable business model for its franchisees, there is not a widespread effort to dump the franchises.

**Any referenced documents speak for themselves; otherwise, denied.**

21.     After Counter-Plaintiffs repeatedly questioned Cold Stone's business model, Cold Stone tried to force Counter-Plaintiffs out of the three franchises.

**Denied.**

22.     By letter dated January 3, 2006, a copy of which is attached to Cold Stone's Complaint as Exhibit 10, Cold Stone informed Jacquatte Rolle that the FSU Campus Store was not in compliance based on a QSCE report. Cold Stone noted that the "backline sink" was not working, there was expired fruit for sale, there was undated fruit for sale, and the store was offering

unauthorized products. Cold Stone also pointed out that there were areas of the store that needed to be cleaned (a shocking revelation in that the store was filled with customers) and that Mrs. Rolle needed to provide proof of insurance.

**Admitted that a January 3, 2006 letter was sent to Jacquatte Rolle and that there were issues/deficiencies at the store. Without sufficient knowledge and therefore denied as to the remaining allegations.**

23.    Interestingly, Cold Stone failed to point out that the FSU Campus Store is a high volume store and it was extremely busy at the time of the inspection. Likewise, while Cold Stone pointed out that Mrs. Rolle had thirty (30) days to cure, Cold Stone failed to point out that several of the errors were corrected on the spot; namely, the expired fruit, the undated fruit, and the unauthorized sauces were immediately removed. Moreover, Cold Stone failed to point out that the store was thoroughly cleaned and thus in compliance by the end of the day.

**Admitted that a January 3, 2006 letter was sent to Jacquatte Rolle and that there were issues/deficiencies at the store. Without sufficient knowledge and therefore denied as to the remaining allegations.**

24.    By letter dated January 20, 2006, a copy of which is attached to Cold Stone's Complaint as Exhibit 10, Cold Stone notified Mr. and Mrs. Rolle that the Tallahassee Mall Store was not in compliance based on a QSCE report. Cold Stone notes that there was mold on cooler gaskets, there was expired flavoring in the cooler, labels were missing, and certain products were out of stock. Finally, Cold Stone noted that the store had not been remodeled and Mrs. Rolle needed to provide proof of insurance.

**Admitted that a January 20, 2006 letter was sent to Jacquatte Rolle and that there were issues/deficiencies at the store. Without sufficient knowledge and therefore denied as to the remaining allegations.**

25.     Interestingly, Cold Stone failed to point out that the gaskets were cleaned, the expired flavoring disposed of, labels affixed and the missing products ordered within thirty (30) days of the QSCE report as required by the franchise agreement. As for the retrofit, Cold Stone agreed to remodel the Tallahassee Mall Store and was legally obligated to do so.

**Admitted that a January 20, 2006 letter was sent to Jacquatte Rolle and that there were issues/deficiencies at the store. Without sufficient knowledge and therefore denied as to the remaining allegations.**

26.     Cold Stone forwarded Counter-Plaintiffs several similar letters and Counter-Plaintiffs corrected the problems for which Counter-Plaintiffs were legally responsible within thirty (30) days as required by the franchise agreements.

**Admitted that Cold Stone forwarded other notices to Counter-Plaintiffs; otherwise, without sufficient knowledge and therefore denied.**

27.     By letter dated October 16, 2006, a copy of which is attached to Cold Stone's Complaint as Exhibit 11, Cold Stone notified Counter-Plaintiffs that they were in default under the franchise agreements.  Interestingly, Cold Stone did not suggest that Counter-Plaintiffs were in default based on QSCE reports or ongoing problems reflected in QSCE reports (this is so because, as reflected above, Counter-Plaintiffs cured the defects within thirty (30) days and, as reflected below, Counter-Plaintiffs' franchisees gross sales were higher than the national average and, in the case of two stores, approximately 30% higher than the national average). Instead,

Cold Stone defaulted Counter-Plaintiffs based solely on monies allegedly owed Cold Stone based on debts assumed by Cold Stone which fall outside the scope of the franchise agreements.

**Admitted that an October 16, 2006 letter was sent to Jacquatte Rolle and that there were issues/deficiencies at the store. Without sufficient knowledge and therefore denied as to the remaining allegations.**

28.     More specifically, Counter-Plaintiffs obtained a bridge loan from Wingfinance, Incorporated, to pay off a prior loan for the acquisition of the Tallahassee Mall Store as well as new sums to finance the acquisition and construction of the Ocala store for a total of approximately $680,000.00 plus interest. Cold Stone was not a party to the loan agreement and thus the loan falls outside the ambit of the franchise agreements which permit termination of a franchise "If Franchisee (or his Principals) fails to pay any monies owed to Franchisor or any of its Affiliates **under this Agreement, or any agreement with Franchisor or its Affiliates."** Here, Cold Stone was not a party to the bridge loan and thus Cold Stone cannot properly recover such monies under the franchise agreements.

**Denied. Cold Stone owns and holds the Note.**

29.     Importantly, Cold Stone knew that Counter-Plaintiffs intended to pay the bridge loan with a SBA loan. Cold Stone was provided with notice that the SBA loan had to be closed within two (2) weeks but never notified Counter-Plaintiffs. Instead, Cold Stone knowingly allowed the time to run on the SBA loan without notifying Counter-Plaintiffs, then assumed the loan from Wingfinance and declared Counter-Plaintiffs in default so as to justify the seizure of the three franchises.

**Denied.**

30.     Upon information and belief, Cold Stone scuttled the sale of the two Tallahassee stores to a third-party potential buyer because Cold Stone wished to sell the three franchises directly so that Cold Stone could recover all monies purportedly owed to it by Counter-Plaintiffs, while at the same time currying favor with the new franchisee(s) by selling the three franchises at a deflated price or keeping the Counter-Plaintiffs' equity.

**Denied.**

31.     There is evidence of Cold Stone's bad faith and intent to seize the franchises for its own ends.  For example, Dan Beem, Vice President of Profitability for Cold Stone, the same "Profitability department" that claims a 20% return, instructed one of Cold Stone's vendors to stop selling to Counter-Plaintiffs when the protocol should have been to alert the franchisees to a payment problem and instruct the vendor to convert the account to cash only until the problem was resolved.  Incredibly, after telling the vendor not to sell to Counter-Plaintiffs, Cold Stone immediately cited Counter-Plaintiffs for not having the product that they were attempting to order from the vendor.

**Denied.**

32.     Similarly, Cold Stone has cited the Tallahassee Mall Store for not automatically reporting sales and has challenged its royalty payments from the store. Cold Stone has criticized the Tallahassee Mall Store for such a failing and has raised the issue with this court even though Cold Stone knows that the Tallahassee Mall Store's reporting system is broken, Counter-Plaintiffs must use Cold Stone's vendor to repair the system, and Cold Stone's vendor has repeatedly failed to repair the machine. This is so despite the fact that Counter-Plaintiffs are charged for such repairs monthly whether such repairs are made or not. Based on Cold Stone's prior actions, Cold Stone would undoubtedly claim Counter-Plaintiffs were in breach of the

franchise agreement if Counter-Plaintiffs used an unauthorized vendor to repair the equipment so as to expedite the process.

**Denied.**

33.    Having fraudulently misrepresented the financial prospects for the franchises and likelihood of success, having harassed Counter-Plaintiffs by citing Counter-Plaintiffs for deficiencies such as dirty restrooms at the peak of business hours, and having insured that Counter-Plaintiffs could not secure financing, Cold Stone now claims that Counter-Plaintiffs are poorly managing the franchises.

**Denied.**

34.    Despite Cold Stone's representations to the contrary, Counter-Plaintiffs' franchises are not poorly managed but continue to outperform other Cold Stone franchisees in spite of Cold Stone's poor business model.

**Denied.**

35.    The FSU Campus Store and the Ocala Store have consistently grossed $500,000.00 per year with the average Cold Stone franchise averaging $381,965.00 per year according to Cold Stone's own website. Even Counter-Plaintiffs' small Tallahassee Mall Store averages around $400,000.00 per year.

**Denied.**

36.    In fact, in the past 18 months, the FSU Campus Store was recognized by Cold Stone as one of its "Top 100 Sales" franchises in February, March, April, October and November of 2006 and the Ocala Store was recognized on the same list in December of 2006 and January and March of 2007.

**To the extent the allegation relies upon documentary evidence, the documents speak for themselves; otherwise, denied.**

37.    Of Cold Stone's 1400 stores, the Tallahassee Mall Store ranked in the "Top 100 Cake %" for March of 2007. The Ocala Store ranked in the "Top 100 Waffle %" for November and December of 2006 and January, February, March and April of 2007. The Ocala Store also ranked in the "Top 100 Like It %" for June of 2006. The FSU Campus Store ranked among the "Top 100 SSS [Same Store Sales] with 100% Sales Reporting" for August of 2006. The individual Counter-Plaintiffs received the Best Marketing Plan award at the National Annual Franchise Meeting in 2005 and the Best Sellers Award at the National Annual Franchise Meeting in 2006.

**To the extent the allegation relies upon documentary evidence, the documents speak for themselves; otherwise, denied.**

38.    Cold Stone uses an affiliate who poses as a customer and evaluates its franchises in terms of customer service and cleanliness. In May of 2007, the Ocala Store received an evaluation of 88.9% and the FSU Campus Store received a score of 96.7%.   While the Tallahassee Mall Store received a low rating of 26.1%, the assistant manager of the FSU Campus Store has recently been transferred to the Tallahassee Mall Store as the new manager, and almost the entire staff was replaced. That is, Counter-Plaintiffs took immediate corrective action when a problem with the Tallahassee Mall Store was identified. Less than three weeks after the replacement of the management, the Tallahassee Mall Store was again evaluated by the same affiliate and scored 76.8%.

**Admitted that evaluations were made of each store.  Without sufficient knowledge as to the remaining allegations and therefore denied.**

39.    During the five reporting periods for the month of July, 2007, the Counter-Plaintiffs have had at least one store ranked in the top five stores in the region based on net sales. The stores have held the first or second position in the two of the five periods. This is despite the fact that FSU and FAMU are on summer break and thus the FSU Campus Store is operating at approximately 40% of its expected fall sales volume.

**Denied.**

40.    In short, Counter-Plaintiffs' franchises are doing well when measured against Cold Stone's average franchises in the region and nationally.

**Denied.**

41.    While neither the default letter nor the termination letter mention any basis for default and/or termination save financial obligations, and notwithstanding the fact that Cold Stone initiated the default in October and waited almost ninety (90) days to terminate, and further notwithstanding the fact that Cold Stone waited an additional six (6) months to initiate these proceedings while Counter-Plaintiffs continued to operate the three stores and produce sales far above the national average, Cold Stone now claims an emergency asking this court to change the status quo and put Counter-Plaintiffs out of business before the issues can be addressed on the merits after a full and fair trial.

**Denied.**

## COUNT I
### Breach of Contract – Unreasonably Withholding Consent for Sale of Franchises

42.    Counter-Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 42 [sic] above.

**Counter-Defendant adopts and incorporates its answers to Paragraphs 1 through 41, above.**

43.    This is an action for damages in excess of Seventy-five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, interest and costs.

**Denied.**

44.    Counter-Plaintiffs sue Cold Stone for breach of contract.

**No response required.**

45.    Pursuant to section 14(b) of each of the franchise agreements, the parties agreed that the Franchisee could sell the franchises with prior written consent and that Franchisor could not unreasonably withhold such consent.

**Admitted.**

46.    Counter-Plaintiffs located a prospective purchaser for the two Tallahassee franchises in the summer of 2006. On information and belief, the prospective purchaser was pre-approved as a franchisee by Cold Stone.

**Without sufficient knowledge and therefore denied as to a potential buyer.  Denied as to pre-approved.**

47.    Counter-Plaintiffs approached Cold Stone with a proposal for the sale of the Tallahassee franchises to a pre-approved purchaser around August of 2006, notwithstanding the fact that Cold Stone had been harassing Counter-Plaintiffs and attempting to collect the $680,000.00 Wingfinance payment, Cold Stone refused to approve the sale without cause.

**Admitted that Counter-Plaintiffs approached Cold Stone in 2006.  Denied as to the remainder of the allegations.**

48.    Upon information and belief, Cold Stone scuttled the sale because Cold Stone wished to sell the three franchises directly so that Cold Stone could recover all monies purportedly owed to it by Counter-Plaintiffs while at the same time currying favor with the new

franchisee(s) by selling the three franchisees at a deflated price or keep the Counter-Plaintiffs equity for themselves.

**Denied.**

49.    As a direct and proximate cause of Cold Stone's wrongful refusal to consent to the sale of the Tallahassee franchises in derogation of the plain language of the franchise agreements, Counter-Plaintiffs were unable to sell the Tallahassee franchises and have suffered, and continue to suffer economic losses.

**Denied.**

50.    Pursuant to section 31 of each of the franchise agreements, the parties agreed that any court or arbitration proceeding relating to the franchise agreement, the prevailing party would be entitled to recover its reasonable attorneys' fees and expenses.

**Admitted.**

**WHEREFORE, Counter-Defendant, Cold Stone Creamery, Inc. demands judgment to be entered in its favor and against Counter-Plaintiffs, Lenora I, LLC, Lenora II, LLC, Lenora III, LLC, Cecil D. Rolle, and Jacquatte Rolle, and further requests for the Court to award reasonable attorneys' fees, costs (including expert witness fees), expenses, and such other and further relief as the Court deems necessary, just and proper, to Counter-Defendant.**

## COUNT II
### Tortious Interference with a Prospective Contractual Relationship

51.    Counter-Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 42 [sic] above.

**Counter-Defendant adopts and incorporates its answers to Paragraphs 1 through 41, above.**

52.    This is an action for damages in excess of Seventy-five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, interest and costs.

**Denied.**

53.    Counter-Plaintiffs sue Cold Stone for tortious interference with a prospective contractual relationship.

**No response is required.**

54.    During the summer of 2006, Counter-Plaintiffs negotiated toward the sale of the FSU Campus Store and the Tallahassee Mall Store with Houston Usry. The parties negotiated the sale of both Tallahassee stores because Counter-Plaintiffs insisted on selling the entire Tallahassee market.

**Without sufficient knowledge and therefore denied.**

55.    Upon information and belief, Houston Usry was pre-approved as a franchisee by Cold Stone prior to the negotiations.

**Denied.**

56.    Cold Stone knew about the existence of the business relationship because a Cold Stone representative spoke with Mr. Usry regarding the sale.

**Without sufficient knowledge and therefore denied.**

57.    When Houston Usry spoke with a representative of Cold Stone regarding the purchase of the Tallahassee stores, Cold Stone informed Mr. Usry that the Tallahassee Mall Store was dirty and unsightly, needed costly repairs and renovations, and that Mr. Usry would be responsible for such costly repairs and renovations.

**Denied.**

58.    When Mr. Usry continued to express interest in purchasing the Tallahassee stores, Cold Stone informed Mr. Usry that it would not consent to the sale of the Tallahassee Mall Store.

**Denied.**

59.    Cold Stone so informed Mr. Usry knowing that the sale would not otherwise be consummated because Counter-Plaintiffs wished to sell both stores and withdraw from the Tallahassee market. Further, Cold Stone was fully aware that the value of the Tallahassee stores was greater if sold as a unit.

**Denied.**

60.    Cold Stone willfully and maliciously thwarted the sale of the Tallahassee stores by Counter-Plaintiffs to Mr. Usry and Cold Stone did so for its own financial gain.

**Denied.**

61.    More specifically, upon information and belief, Cold Stone scuttled the sale because Cold Stone wished to sell the franchises directly so that Cold Stone could recover all monies purportedly owed to it by Counter-Plaintiffs while at the same time currying favor with the new franchisee(s) by selling the three franchises at a deflated price or keep the Counter-Plaintiffs' equity for themselves.

**Denied.**

62.    Unfortunately, with Cold Stone blocking the sale of the Tallahassee Franchises last summer, the market for Cold Stone franchises has now plummeted. As of July 2007, no less than 16.64% of all Cold Stone franchises were listed for sale with many of those franchises listed for far less than the current start up costs for a new Cold Stone franchise which is between $294,250.00 and $438,850.00 according to Cold Stone's own website

**Denied.**

63.     Further, based on Cold Stone's criticism of the Tallahassee Mall Store specifically, and Counter-Plaintiffs generally, Cold Stone has undercut Counter-Plaintiffs ability to secure the fair market value of the stores even if Cold Stone now consented to the sale of those stores.

**Denied.**

64.     As a direct and proximate cause of Cold Stone's actions, Counter-Plaintiffs were unable to sell the Tallahassee franchises and have suffered, and continue to suffer economic losses.

**Denied.**

**WHEREFORE, Counter-Defendant, Cold Stone Creamery, Inc. demands judgment to be entered in its favor and against Counter-Plaintiffs, Lenora I, LLC, Lenora II, LLC, Lenora III, LLC, Cecil D. Rolle, and Jacquatte Rolle, and further requests for the Court to award reasonable attorneys' fees, costs (including expert witness fees), expenses, and such other and further relief as the Court deems necessary, just and proper, to Counter-Defendant.**

### COUNT III
### Florida Franchise Act -- §817.416 et seq. Florida Statutes

65.     Counter-Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 42 [sic] above.

**Counter-Defendant adopts and incorporates its answers to Paragraphs 1 through 41 above.**

66.     This is an action for damages in excess of Seventy-five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, interest and costs.

**Denied.**

67.    Counter-Plaintiffs bring this action under the Florida Franchise Act pursuant to section 817.416(3), Florida Statutes.

**No response is required.**

68.    Cold Stone is a corporation and thus Cold Stone is a "person" under the Florida Franchise Act as defined by section 817.416(1)(a), Florida Statutes.

**To the extent paragraph 68 contains conclusions of law, no response is required. Otherwise, denied.**

69.    Counter-Plaintiffs and Cold Stone entered into franchise agreements as defined by section 817.416(1)(b), Florida Statutes.

**To the extent paragraph 69 contains conclusions of law, no response is required. Otherwise, denied.**

70.    As detailed above, when selling the franchises to Counter-Plaintiffs, Cold Stone intentionally misrepresented the prospects or chances for success of the proposed franchisees in derogation of section 817.416(2)(a)(1), Florida Statutes.

**To the extent paragraph 70 contains conclusions of law, no response is required. Otherwise, denied.**

71.    As a direct and proximate cause of such misrepresentations, Counter-Plaintiffs have suffered, and continue to suffer economic losses.

**Denied.**

**WHEREFORE, Counter-Defendant, Cold Stone Creamery, Inc. demands judgment to be entered in its favor and against Counter-Plaintiffs, Lenora I, LLC, Lenora II, LLC, Lenora III, LLC, Cecil D. Rolle, and Jacquatte Rolle, and further requests for the Court to award reasonable attorneys fees, costs (including expert witness fees), expenses, and such**

other and further relief as the Court deems necessary, just and proper, to Counter-Defendant.

**COUNT IV**
**Florida's Deceptive and Unfair Trade Practices Act**
**-- *501.201, et seq., Florida Statutes**

72.     Counter-Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 42 [sic] above.

**Counter-Defendant adopts and incorporates its answers to Paragraphs 1 through 41, above.**

73.     This is an action for damages in excess of Seventy-five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, interest and costs.

**Denied.**

74.     Counter-Plaintiffs bring this action under the Florida Deceptive and Unfair Trade Practices Act, section 501.201, et seq., Florida Statutes.

**No response is required.**

75.     Cold Stone is engaged in trade or commerce with things of value as defined in section 501.203(8) & (9), Florida Statutes.

**To the extent paragraph 75 contains conclusions of law, no response is required. Otherwise, denied.**

76.     Cold Stone violated section 501.204, Florida Statutes, by committing unfair, deceptive and unconscionable acts and practices as detailed above.

**To the extent paragraph 76 contains conclusions of law, no response is required. Otherwise, denied.**

77.    The acts and practices are continuing in nature, and Cold Stone commits these deceptive and unfair acts as a regular and common business practice.

**Denied.**

78.    Counter-Plaintiffs were damaged by the deceptive and unfair acts.

**Denied.**

79.    Counter-Plaintiffs were aggrieved by the acts and practices alleged above, and pursuant to section 501.2105 and section 501.211(2), Florida Statutes, demand attorney's fees and costs.

**Denied.**

**WHEREFORE, Counter-Defendant, Cold Stone Creamery, Inc. demands judgment to be entered in its favor and against Counter-Plaintiffs, Lenora I, LLC, Lenora II, LLC, Lenora III, LLC, Cecil D. Rolle, and Jacquatte Rolle, and further requests for the Court to award reasonable attorneys fees, costs (including expert witness fees), expenses, and such other and further relief as the Court deems necessary, just and proper, to Counter-Defendant.**

## AFFIRMATIVE DEFENSES

1.    Counter-Plaintiffs are entitled to no relief because they have failed to state a claim for relief.

2.    Counter-Plaintiffs are entitled to no relief because they have failed to satisfy the condition precedent of good faith and fair dealing, including due to their conduct as alleged in the amended complaint in this matter.

3.    Counter-Plaintiffs are entitled to no relief because they have failed to satisfy the condition precedent of cooperation, including due to their conduct as alleged in the amended complaint in this matter.

4.    Counter-Plaintiffs are entitled to no relief in accordance with the doctrine of unclean hands, including due to their conduct as alleged in the amended complaint in this matter.

5.    Counter-Plaintiffs' requested relief is barred to the extent that Counter-Plaintiffs have failed to mitigate any alleged damages.

6.    Counter-Plaintiffs are entitled to no relief because Counter-Defendant has substantially and materially performed any and all obligations under the alleged agreements.

7.    Counter-Plaintiffs are entitled to no relief because they breached the alleged agreements, as alleged in the amended complaint in this matter.

8.    Counter-Plaintiffs are entitled to no relief because any alleged interference by Counter-Defendant was privileged, in that Counter-Defendant was not a stranger to the alleged business relationship and Counter-Defendant's actions were aimed at protecting its own contractual rights.


**WHEREFORE, Counter-Defendant, Cold Stone Creamery, Inc. demands judgment to be entered in its favor and against Counter-Plaintiffs, Lenora I, LLC, Lenora II, LLC, Lenora III, LLC, Cecil D. Rolle, and Jacquatte Rolle, and further requests for the Court to award reasonable attorneys fees, costs (including expert witness fees), expenses, and such other and further relief as the Court deems necessary, just and proper, to Counter-Defendant.**

Dated this 11th day of December, 2007.

Respectfully Submitted,

**GREENBERG TRAURIG, P.A.**
101 East College Avenue
Post Office Drawer 1838
Tallahassee, Florida 32302
Phone: (850) 222-6891
Fax: (850) 681-0207

_____
**LORENCE JON BIELBY**
**Florida Bar No. 0393517**
**JOHN K. LONDOT**
**Florida Bar No. 0579521**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

U.S. Mail this 11th day of December, 2007, to the following:

Charles P. Young, Esq.
Emmanuel, Sheppard & Condon
30 South Spring Street
P.O. Drawer 1271
Pensacola, FL 32596
Fax: (850) 429-0492
Phone: (850) 433-6581

_____
**JOHN K. LONDOT**